ROTH, P. J.
—I concur in the opinion and disposition of the appeal reached by my learned colleague. However, I believe that it would have been possible to affirm the judgment upon bases not considered in the court’s opinion. The exhibits in the record and undisputed evidence reveal that Tassone has already been paid in full for everything he delivered to Meredith; and that Tassone does not have a valid chattel mortgage as has been determined by the trial court in the findings and judgment before us.
Tassone predicates his “security interest” on a sale made by him to Meredith on August 19, 1974, whereby Tassone sold his inventory and fixtures and allegedly sold his business operated under the name of “Gus Dandos Raleigh Cycle Center" (Dandos) and the good will thereof to Meredith. The sale was consummated by: (a) payment of $18,000 cash; (b) the execution of three documents included in Tassone’s exhibit C entitled (1) “Agreement” (Agreement), (2) “Security Agreement—Accounts Receivable,” and (3) “Security Interest in Goods and Chattels;” and (c) execution of a promissory note for $20,902.86 (defendant’s exhibit D) called for by Agreement.
In pertinent part, Agreement provides:
“1. The Buyer shall pay the total of the following items to Seller which shall be the total purchase price for ‘Dandos’:
“A. $20,000.00 for goodwill.
“B. The value of the inventory as of the date of this Agreement, plus four (4%) percent.
“C. The value of all trade fixtures, including signs, as of the date of this Agreement.
*704 “2. Seller shall execute a bill of sale to Buyer.
“3. The Buyer shall, on the execution of this Agreement, pay to Seller the sum of Eighteen Thousand ($18,000.00) Dollars in cash. The balance of the purchase price is to be evidenced by a promissory note payable over a five (5) year period with interest at Ten (10%) percent per year on the unpaid balance to be secured by the inventory, trade fixtures and receivables of the transferred business.[1] The Buyer shall, in addition, have the right to pre-pay some or all of the unpaid balance without penalty.
“4. The Seller shall cause all outstanding obligations of ‘Dandos’ to be paid in full as of the date of execution of this Agreement.
“6. Buyer shall not use the name, ‘Gus Dandos’ in any manner whatsoever in connection with his newly acquired bicycle business. Further, Buyer shall cause the name ‘Gus Dandos’ to be removed from all advertising and signs dealing with the subject business.
“10. The Seller makes no representations or warranties concerning the future financial prospects of ‘Dandos.’ For the record, the Buyer is veiy well acquainted with the business he is purchasing because of his employment by the business. The Buyer is entering into this Agreement on his own information and his own understanding of the facts and not in reliance on any representations by the Seller.” (Italics added.)
Agreement further provides for immediate termination of the lease; the discontinuance of all utility arrangements for the Dandos premises; and requires Meredith to make all his own arrangements for lease with the landlord; for the utilities; with the Board of Equalization and also provides for various forms of indemnity from Meredith to Tassone for all deposits previously made on the lease or with the various utilities.
Exhibit C, in addition to Agreement, contains as mentioned above, a “Security Agreement—Accounts Receivable” (document (2) limited to *705 “receivables” as therein defined and not involved at bench), and also document (3) entitled “Security Interest in Goods and Chattels” (“Security Interest”) which embraces the merchandise inventory “. . . tools, and trade fixtures and signs and accounts receivable . . . .” This “Security Interest” agreement provides in pertinent part:
“2. Debtor hereby grants Secured Party a continuing security interest in the goods (as defined in Article 9 of the Uniform Commercial Code) described in the annexed Exhibit ‘A’.[2] Debtor also grants Secured Party a continuing security interest in all proceeds and products of the Collateral.
“3. The security interest so granted shall be to secure the payment of all principal and interest and the true, full and exact performance and observance of all of the covenants and conditions of that certain installment note marked Exhibit ‘B’[3] (herein referred to as the ‘Obligation’) and made a part hereof as if set forth in full herein.
“9. Upon Debtor’s default hereunder, then, at the option of the Secured Party and without notice or demand, all of the unpaid installments and other Obligations of Debtor hereunder shall become immediately due and payable and then and thereafter the Secured Party shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as it exists at the time of the execution hereof and hereafter. In addition, the Secured Party shall have the right: to take and maintain possession of the Collateral and in so doing, alone or with any other person, enter upon the premises where the Collateral may be found or believed by the Secured Party to be located, and to maintain such possession and dispose of the Collateral on any premises of Debtor or under Debtor’s control; and/or to remove such Collateral or any part thereof to any place the Secured Party may desire. If requested by the Secured Party to do so, Debtor shall assemble and make the Collateral available to the Secured Party at a place to be designated by the Secured Party.”
In my opinion, the “Security Interest” is, as the trial court found, invalid. It is true as pointed out that the trial court based its opinion of *706 invalidity upon violation of the bulk sales law. And it is also true that Raleigh tried its case on that theoiy. However, it is well settled law that if the facts before the trial court support the judgment rendered on a different theoiy, an appellate court may support the judgment on such a theory. (Davey v. Southern Pacific Co. (1897) 116 Cal. 325, 329 [48 P. 117]; Harley v. Superior Court (1964) 226 Cal.App.2d 432, 435 [38 Cal.Rptr. 72].)[4]
Section 9204, a portion of article 9 of the Uniform Commercial Code, provides in pertinent part: “(1) A security interest cannot attach until there is agreement. . . that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.” (Italics added.)
It is apparent from a comparison of the amount of the promissory note ($20,902.86) and the purchase price as fixed by paragraphs 1, A, B and C and other portions of Agreement that the $18,000 paid by Meredith in cash to Tassone represented payment in full for all the inventoiy sold by Tassone to Meredith and that, except for the sum of $902.86, the note for $20,902.86 represented payment for good will.[5] It is also apparent from an analysis of Agreement, the other documents in exhibit C, the note and the facts that no good will was sold or delivered. To the contraiy, paragraph 6 of the Agreement above quoted and other clauses of the Agreement expressly require an elimination of the name of Gus Dandos or Dandos from the business and enjoin Meredith from using the name or the signs “Gus Dandos” or “Dandos” although the signs were apparently part of the subject matter sold. Meredith received, and Tassone transferred, no good will except such as might flow from the physical location of the business with respect to which no lease was transferred. And even as to this one illusive item of good will, to wit: the physical location over which Tassone presumably had some control, Tassone not only did not transfer the signs or his lease on the premises, but he specifically withheld a transfer. Tassone made no covenant that he would guarantee a transfer of the léase or even assist in the consumma *707 tion of a transfer thereof. The Agreement does in fact provide the contrary: “It is understood between the parties that the current property lease between Seller and his lessor shall be terminated. The Buyer shall enter into a new lease directly with the lessor.” (Italics added.) The record does not show the term of the Tassone lease or that it was in fact ever transferred; whether a new one was made by Meredith for a fixed term; or whether Meredith occupied the premises as a month-to-month tenant or any of the other terms of Meredith’s tenancy. The record shows affirmatively that Tassone could not and did not transfer to Meredith the name “Raleigh Cycle Center” nor did he or could he transfer the franchise to dispose of merchandise manufactured or distributed solely by Raleigh. In this connection the record suggests that on some date preceding November 4, 1974, Meredith negotiated for such a franchise and succeeded in obtaining one on or about Januaiy 1, 1975.
The trial court found pertinent facts as follows:
“2. Within two years prior to filing the present lawsuit, Dennis Wayne Meredith dba Raleigh Cycle Center, became indebted to the plaintiff, and at the time of trial was indebted to the plaintiff in the amount of $18,465.32, plus interest thereon at the legal rate, from November 30, 1974. ...
“6. On or about February 21, 1975, the defendant Frank Tassone was given and took full and complete possession of the business known as Raleigh Cycle Center, and Frank Tassone took over the possession of the inventory and other assets.
“7. On or about February 21, 1975, all of the assets, including all inventory, equipment and fixtures, of Raleigh Cycle Center were picked up by Frank Tassone and transferred to his own place of business.[6]
“8. At the time the assets were transferred to Frank Tassone, and at the time he took possession of Raleigh Cycle Center, he did not have a valid, security interest in any of the goods of Raleigh Cycle Center, *708 including the inventory and fixtures and equipment, as against creditors of Meredith.
“11. In connection with the transfer of assets to Frank Tassone, there was no notice of such transfer recorded or published, of any kind, including the notice required by Commercial Code Section 6102 et seq., and particularly Section 6107.”
A fair analysis of the documents executed to consummate the Tassone-Meredith transaction equates with an attempt to acquire a “Security Interest” unrecorded, unfiled and unknown,[7] on inventory which had been paid for in full on the date it was delivered, for good will valued at $20,000 which good will, however, was not only not delivered but expressly withheld.
To summarize, before Meredith amiably surrendered his inventory to Tassone on request therefor, Meredith, on premises theretofore used by Tassone, had operated for the limited period of six months a bicycle shop business with the inventory, fixtures and good will for which he had obligated himself to pay Tassone approximately $40,000. During that six month period, Meredith purchased additional merchandise on credit, of which at least $18,000 worth was from Raleigh, which amount was unpaid. Among other debts, Meredith allegedly owed approximately $20,000 to Tassone. To satisfy that $20,000 debt, Tassone with Meredith’s consent, picked up the entire Meredith inventory and removed it to his new place of business. It is clear that if this inventory is sold to satisfy Tassone’s alleged “security interest” he will receive payment in full for a marketable commodity which he never delivered. The expeditious and summary manner adopted by Meredith and Tassone to satisfy Tassone’s debt in full to the exclusion of other creditors but with their merchandise appears to be “sickbed o’er with the pale cast. ..” of fraud.

The payment of $18,000 was made and note delivered as required by document (1) Agreement and the security furnished by document (3). The record does not show anv accounts receivable: the trade fixtures are in the undisputed possession of Tassone and are not, nor are any accounts receivable, involved in this litigation.

Exhibit A is not annexed and is not in the record.

This exhibit B is exhibit D in the record.

Even the parties may change their theory on appeal when questions of law alone are presented. (Ward v. Taggart (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; Mitchell v. Marklund (1965) 238 Cal.App.2d 398, 403 [47 Cal.Rptr. 756].)

The record does not suggest the value of the fixtures. The fixtures, however, are not in any way involved in this action and as stated in footnote 1 are not, nor were they ever made a part of the injunctive order or the judgment appealed from. It is difficult to believe that the value of the fixtures was less than $902.86.

Because of a default with respect to payments due to Tassone from Meredith on the $20,000 promissory note, Meredith by voluntary arrangement with Tassone and without notice to anyone allowed Tassone to take possession of his complete inventory and move it to a vacant storeroom controlled by and in the possession of Tassone.

In pertinent part, finding 5 states: ". . Neither . . . security agreement nor a financing statement had been filed with the Secretary of State or any other filing officer.”